**SO ORDERED.**
**SIGNED this 17 day of May, 2017.**

_____
**Joseph N. Callaway**
**United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## GREENVILLE DIVISION

| | |
|---|---|
| IN RE: | CASE NO. |
| MICHAEL L. JOHNSON | 17-00218-5-JNC |
| | CHAPTER 13 |
| DEBTOR | |

### ORDER ALLOWING MOTION TO COMPEL

The matter before the court is the Motion to Compel Debtor to Assume or Reject Lease Agreement filed by creditor RTO National, LLC ("RTO") on January 31, 2017 (D.E. 16; the "Motion to Compel"). A Response in Opposition was filed by the Debtor on February 9, 2017 (D.E. 19; the "Response"). A hearing was held on April 5, 2017 in Greenville, North Carolina, following which the court took the matter under advisement. After a review of the record and arguments of counsel at the hearing, the matter is ready for determination.

### JURISDICTION

This matter is a core proceeding pursuant to 28 U.S.C. § 157, and this court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157, and 1334. This court has the authority to hear this matter pursuant to the General Order of Reference entered August 3, 1984 by the United States District Court for the Eastern District of North Carolina.

## BACKGROUND

Michael L. Johnson ("Mr. Johnson" or the "Debtor") filed a voluntary petition for relief under chapter 13 of the Bankruptcy Code on January 16, 2017. Prior to filing, Mr. Johnson entered into a "Consumer Rental Purchase Agreement" on March 8, 2016 (D.E. 16, Ex. A.; the "Agreement"). Pursuant to the terms of the Agreement, Mr. Johnson contracted to buy or lease a ten foot by twelve foot storage shed or small barn (the "Barn")[1] through a stream of "rental payments" in the amount of $52.64 per month for fifty-seven months, along with a loss damage waiver fee of $4.95 per month and taxes of $3.68 per month. The full payment due RTO each month is therefore $61.27 (the "Rental Payment"). As of the Agreement's execution date, the cash price to purchase the Barn outright was $1,520.74, including taxes (the "Cash Price").

The Agreement continues on a month-to-month basis so long as Mr. Johnson continues to make the monthly Rental Payment. At the conclusion of the fifty-seven month period, the Agreement allows the Debtor to make a final payment of $183.81 (the "Balloon Payment"), representing three Rental Payments, at which point the lease terminates and Mr. Johnson becomes the owner of the Barn. D.E. 16, Ex. A. at ¶ 5. In total, and excluding sales tax and damage waiver, under the Agreement Mr. Johnson would pay $3,158.40 to RTO over the course of the fifty-seven month period, representing $52.64 per month plus the Balloon Payment. Alternatively, Mr. Johnson has the option to purchase the Barn at any time during the life of the Agreement at a significant discount by simply paying the remaining balance of Rental Payments owed, multiplied by sixty-five percent, plus the applicable sales tax (the "Early Purchase Option"). Only Mr.

---

[1] At times the Barn is referenced as the "Property" in the Agreement.

Johnson may exercise the Early Purchase Option; RTO has no right to force a purchase of the Barn even if a default occurs.

On Schedule D of his petition, Mr. Johnson listed RTO as holding a claim in the amount of $2,108.17 secured by a lien on a "utility storage barn," presumably the Barn as identified here. Mr. Johnson listed no executory contracts or unexpired leases on Schedule G of his petition. In his proposed chapter 13 plan, Mr. Johnson seeks to retain the Barn and pay RTO a total of $600.00, the alleged value of the Barn as of the petition date, at an annual interest rate of 5.5 percent. In this case, Mr. Johnson consistently asserts an ownership interest (albeit subject to a lien) rather than a leasehold or rental interest in the Barn. Further, he does not seek to set aside or avoid the purported security interest of RTO.

At the April 5, 2017 hearing, counsel for the Debtor explained that the Barn is not affixed to the Debtor's real property and is only secured by pins in the ground or on a pad. As a result, the Barn remains personal property and is a consumer good; it is not a fixture. *See* N.C. GEN. STAT. § 25-9-102(23). No financing statement was filed with the North Carolina Secretary of State by RTO. RTO filed its proof of claim on April 10, 2017 and included a prepetition arrearage claim in the amount of $152.54 as of the petition date (Claim No. 6-1). No competent evidence was presented at the hearing by either party to establish the actual present value of the Barn, or to project its value at a later date.

The Agreement required the Debtor to provide a one-time security deposit equal to one monthly payment at the outset of the transaction (the "Security Deposit"). In addition, the Agreement provides that the Debtor accepts the risk of loss for the Barn; the Debtor is responsible for ongoing maintenance of the Barn; certain uses of the Barn are prohibited; and the Debtor may pledge or encumber the Barn.

3

The Agreement also specifically addresses its termination and the consequences of termination, stating:

> You [the Debtor] can terminate this Agreement at any time by returning the Property to us or arranging with us for its return and paying all amounts due to us on the date of termination. If you terminate, you agree to return the Property to us in the same condition it was on this date, normal wear and tear excepted. If you terminate, you will still owe us any past-due rental payments, and you will continue to owe rent until you return the Property to us.

D.E. 16, Ex. A., at ¶ 11. Upon termination, the Debtor is entitled to receive a refund of the Security Deposit if all payments are current. In addition, the Agreement is subject to automatic termination by RTO upon the Debtor's failure to remit a "timely renewal payment." D.E. 16, Ex. A at ¶ 12. Upon a failure to pay, RTO may immediately take possession of the Barn and assess all repossession costs and attorney's fees against the Debtor.

In the Motion to Compel, RTO contends that the Agreement is a true lease and asks the court to compel the Debtor to assume or reject it in accordance with 11 U.S.C. § 365. Mr. Johnson, in his Response, asserts that he owns that Barn and RTO has only a security interest under the Agreement, relying primarily on the terms stating that Mr. Johnson assumed all responsibility for risk of loss and the existence of the Early Purchase Option.

## DISCUSSION

The primary issue before the court is whether the Agreement is a true lease or a disguised secured transaction. Pursuant to the choice of law provision contained in the Agreement, North Carolina law is applicable. If the Agreement is a true lease, Mr. Johnson must assume or reject it as an executory contract pursuant to 11 U.S.C. § 365(d)(2) and amend his chapter 13 plan accordingly. On the other hand, if the Agreement is a disguised sale and secured transaction, then the Debtor must treat the claim as secured through his chapter 13 plan and make monthly payments

4

(presumably "inside" the plan) to RTO based on the actual value of the consumer good. *See* 11 U.S.C. §§ 506 and 1325(a)(5).

The Debtor bears the burden to prove that the Agreement is not a true lease, as he is the party seeking to reclassify the Agreement. *See In re Purdy*, 763 F.3d 513 (6th Cir. 2014) (citations omitted) (explaining that "at all points in this analysis, the party challenging the leas[e] bears the burden of proving that [it] is something else").

Generally speaking, a lease invokes only temporary possession of the item at hand and the possessing party is contractually obligated to return the subject good or property to the owner "'with some expected residual interest of value remaining at the end of the lease term.'" *In re QDS Components, Inc.,* 292 B.R. 313, 322 (Bankr. S.D. Ohio 2002) (quoting James J. White & Robert S. Summers, *Uniform Commercial Code*, vol. 4, § 30–3 (5th ed., West 2002)). A sale of a good, on the other hand, passes ownership title to the possessing party without condition or retention of ownership interest even if the item is pledged back. The collateralization of the item does not defeat ownership, as "'a security interest is only an inchoate interest contingent on default and limited to the remaining secured debt.'" *Id.* (citations omitted); *see also Purdy*, 763 F.3d at 518.

In North Carolina, a security interest is specifically defined as "an interest in personal property or fixtures which secures payment or performance of an obligation." N.C. GEN. STAT. § 25-1-201(35).[2] The transfer and retention of property rights in bankruptcy cases are governed and determined by state law. *Butner v. United States*, 440 U.S. 48, 55 (1979). North Carolina, along with all other states, has adopted the Uniform Commercial Code ("UCC"), which is codified in

---

[2] *See also* N.C. GEN. STAT. § 25-2A-103(j) (a "lease" is a "a transfer of the right to possession and use of goods for a term in return for consideration, but a sale, including a sale on approval or a sale or return, or retention or creation of a security interest is not a lease. Unless the context clearly indicates otherwise, the term includes a sublease. The term includes a motor vehicle operating agreement that is considered a lease under § 7701(h) of the Internal Revenue Code.").

Chapter 25 of the North Carolina General Statutes. Section 1-203 of Article 1 of Chapter 25 of the North Carolina General Statutes, entitled "Lease Distinguished from Security Interest," controls whether an agreement constitutes a lease or creates a security interest.

### A.  UCC § 1-203(b): The Bright-Line Test

The statute begins by providing, "whether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case." N.C. GEN. STAT. § 25-1-203(a). Thus, the individual facts presented in each case are a key component. However, Section 1-203(b) of the UCC, as codified by North Carolina in North Carolina General Statutes § 25-1-203(b), provides further detail, stating:

> (b) A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, and:
> (1) The original term of the lease is equal to or greater than the remaining economic life of the goods;
> (2) The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;
> (3) The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement; or
> (4) The lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.

N.C. GEN. STAT. § 25-1-203(b).

This statutory provision is commonly referred to as a "bright line" test. *See, e.g.*, *In re Southeastern Materials, Inc.*, 433 B.R. 177 (Bankr. M.D.N.C. 2010). A purported lease satisfies the bright line test and is classified as a security agreement as a matter of law if it "is *not* subject to termination by the lessee *and* . . . at least one of the four conditions is satisfied." *Id.* at 181 (emphasis added) (citations omitted). Conversely, if the agreement at issue is "terminable by the lessee . . . then a security interest will not be conclusively found to exist, and the court will need

6

to consider other factors." *In re Phoenix Equip. Co., Inc.*, No. 2:08-bk-13108-SSC, 2009 WL 3188684, at *3 (Bankr. D. Ariz. Sept. 30, 2009); *see also In re Johnson*, No. 15-00104-NPO, 2015 WL 1508460, at *4 (Bankr. S.D. Miss. Mar. 27, 2015) (explaining that if the bright line test contained in UCC § 1-203(b) is not met, then the court "must examine the facts and circumstances of the transaction . . . .")

In this case, the Agreement specifically provides Mr. Johnson with a right to terminate the Agreement at any time and for any reason. His right to terminate does not subject him to any penalty beyond the monthly rental payments accruing prior to the return of the Barn. He is not obligated to continue making payments after he no longer holds possession of the Barn. At the hearing and in his Motion, Mr. Johnson did not contend to the contrary or assert that the right to termination was purely illusory.

Because the right to terminate is clearly established in the Agreement, the first prong of the bright line test contained in North Carolina General Statutes § 25-1-203(b) is not met. As a result, a per se security interest does not exist under the terms of the Agreement. The court need not engage in additional inquiry as to the second prong of the bright line test, the existence of one of the four enumerated factors contained in § 25-1-203(b)(1)-(4). However, while the Agreement does not conclusively create a security interest pursuant to § 25-1-203(b), the court's analysis is not complete.

### B.  Economic Realities of the Transaction

Because the court cannot conclude that a security interest exists as a matter of law under the bright line test contained in § 25-1-203(b), it must look to the economic realities surrounding the transaction. *See In re Lash*, No. 10-51171, 2010 WL 5141760 (Bankr. M.D.N.C. Dec. 9, 2010) (citing *Duke Energy Royal, LLC v. Pillowtex Corporation (In re Pillowtex, Inc.)*, 349 F.3d 711

7

(7th Cir. 2003)). The primary threshold for doing so is to consider whether the creditor-lessor retained a "meaningful reversionary interest" in the collateral at issue. *Id.* at *6. If the creditor-lessor retains a reversionary interest, an agreement may then be classified as a true lease.

The reported cases primarily focus on two factors in considering whether a creditor-lessor retains a reversionary interest in the collateral at issue. First, courts consider whether the proposed purchase option price is nominal. *Johnson*, 2015 WL 1508460, at *5 (citations omitted). Second, courts consider whether a debtor-lessee acquires equity in the collateral at issue. *Id*. If both of these factors are satisfied, a reversionary interest does not exist, and the purported lease at issue will be classified as a security agreement. *Id*. Other courts have expanded upon those two factors, as the UCC requires consideration of the specific facts of an individual case. *See* N.C. GEN. STAT. § 25-1-203(a). Some courts review "whether the lessee develops equity in the property, such that the only economically reasonable option for the lessee is to purchase the goods." *Purdy,* 763 F.3d at 520 (citations omitted); *see also Lash*, 2010 WL 5141760, at *6 (explaining that if "the lessee's only economically sensible option is to exercise the [purchase] option, then the agreement will be considered to create a security interest") (citing *In re Grubbs Constr. Co.*, 319 B.R. 698, 716 (Bankr. M.D. Fla. 2005)).

C.  **Nominality of Option Price or Early Purchase Option**

The UCC does not explicitly define the term "nominal." However, North Carolina General Statutes § 25-1-203(d)(2) is instructive and provides that "additional consideration is *not* nominal if . . . (2) when the option to become the owner of the goods is granted to the lessee, the price is stated to be the fair market value of the goods at the time the option is to be performed." (emphasis added). Such a determination is made "with reference to the facts and circumstances at the time

the transaction is entered into." N.C. GEN. STAT. § 25-1-203(e). Accordingly, the court must consider whether a purchase option price is nominal as measured at the outset of the transaction.

Here, while it is not formally termed a purchase option, the Agreement effectively provides for a buy-out through two mechanisms – the Balloon Payment and the Early Purchase Option. The Balloon Payment amounts to three Rental Payments, and if the Debtor elects to make the Balloon Payment at the conclusion of the Agreement's fifty-seven month term, he will become the legal owner of the Barn. As a result, the Balloon Payment, which is equal to twelve percent (12%) of the Barn's Cash Price, serves as a purchase option at the conclusion of the Agreement. Alternatively, as noted above, the Debtor may become the owner of the Barn by exercising the Early Purchase Option. Pursuant to the Agreement, he must pay sixty-five percent of the remaining balance owed under the Agreement at the time he exercises that option.

The Debtor did not present any evidence as to the fair market value of the Barn, or the asserted nominality of the Balloon Payment or the Early Purchase Option (together, the "Option Price"), at any time in the history of the transaction. RTO likewise did not present any evidence as to the value of the Barn, aside from the Agreement itself. As a result, the court is without evidence outside of the Agreement to enable it to evaluate an argument concerning the nominal nature of the Option Price, whether exercised at the beginning, middle, or end of the fifty-seven month term established in the Agreement. However, it stands to reason that if the Barn was worth only $600 as of the petition date as contended by Mr. Johnson, being eleven months into the fifty-seven month term, a value approximately one-third of that amount forty-six months later would not be unreasonable. The court has nothing else to render an estimated value. Based upon the lack of any other evidence as to the fair market value of the Barn, and given that the burden is on the party challenging the lease, the court cannot conclusively determine if the Option Price, whether paid as

9

the Balloon Payment at the conclusion of the fifty-seven month term or the Early Purchase Option during the life of the Agreement, is a nominal amount. As a result, the court is unable to hold or determine for purposes of this matter that RTO did not retain a meaningful reversionary interest in the Barn.

### D. Debtor's Right to Acquire Equity

The second factor requires the court to consider whether the Debtor has the right to gain equity in the Barn. *Johnson*, 2015 WL 1508460, at *5. In order to conduct a proper inquiry on this issue, the court must compare the proposed Option Price to the Barn's fair market value when (and if) exercised. If the Barn's fair market value is considerably higher than the Option Price, the Debtor likely accumulated equity in the Barn through the Rental Payments. A reduced Option Price would reflect this accumulation of equity and point to the Agreement as creating a security interest.

Again, no evidence of the fair market value of the Barn was presented to the court other than the Agreement itself. Excluding taxes, Mr. Johnson is contractually obligated to pay a total of $3,158.40 over the course of the Agreement for an asset apparently worth $1,421.25 at the outset of the transaction. However, without evidence of the fair market value of the Barn at the time the Option Price is to be paid, and other factors such as the historical risk of nonpayment and costs associated with collection for the Barn or similar items, the court is unable to determine whether the stream of Rental Payments provided Mr. Johnson with any equity in the Barn at the end of the day. The court also is without evidence concerning whether the only economically reasonable decision for Mr. Johnson is to exercise the purchase option and pay the Option Price during or at least by the conclusion of the lease (at that point, the Balloon Payment). As a result, the court cannot establish whether or not Mr. Johnson, as the lessee-debtor, has acquired or will acquire

equity in the Barn. Due to the absolute lack of evidence, the court cannot find that the economic realities surrounding the Agreement created anything but a true lease of the Barn between the parties.

### E. UCC § 1-203(c)

In his Motion, Mr. Johnson contends that the Agreement "actually creates a security interest" based on two of its specific terms, (1) that he assumed the risk of loss for the Barn, and (2) that the Agreement provides for an Early Purchase Option. Section 1-203(c) of the UCC, as adopted by North Carolina in North Carolina General Statutes § 25-1-203(c), provides that "a transaction in the form of a lease *does not* create a security interest *merely because*" of the existence of any of six enumerated factors. *Id*. (Emphasis added).

The statute provides:

> (c) A transaction in the form of a lease does not create a security interest merely because:
>> (1) The present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into;
>> (2) The lessee assumes risk of loss of the goods;
>> (3) The lessee agrees to pay, with respect to the goods, taxes, insurance, filing, recording, or registration fees, or service or maintenance costs;
>> (4) The lessee has an option to renew the lease or to become the owner of the goods;
>> (5) The lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed; or
>> (6) The lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

N.C. GEN. STAT. § 25-1-203(c). In this case, Mr. Johnson relies upon the second and sixth factors in asserting that the Agreement creates a valid security interest, but the statute makes clear that the

satisfaction of any of the six factors fails to constitute adequate grounds to reclassify a true lease as a security agreement. As a result of the court's analysis with respect to the economic impact, and considering the Debtor's burden of proof, the court need not consider whether satisfaction of only two of the six enumerated factors weighs in favor of finding a sale and security interest rather than lease in this case.

## CONCLUSION

The Agreement fails the bright line test contained in North Carolina General Statutes § 25-1-203(b). RTO retained a meaningful reversionary interest in the Barn, as the Debtor did not meet his burden to demonstrate otherwise. Based upon the foregoing, the Agreement will be treated as a true lease under the evidence presented in this matter. Accordingly, RTO's Motion to Compel is allowed.

The Debtor is directed to assume or reject the Agreement pursuant to 11 U.S.C. § 365(d)(2) within fourteen (14) days of entry of this order. The Debtor is further directed to amend his proposed chapter 13 plan if necessary to reflect assumption of the Agreement, should he choose to retain the Barn.

**END OF DOCUMENT**